## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| MICHAEL LEE HOOD, | ) | CASE NO. 4:09CV3245 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MEMORANDUM |
| | ) | AND ORDER |
| MICHAEL J. ASTRUE, as | ) | |
| Commissioner of the Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

Now before the Court is the Complaint of Plaintiff Michael Lee Hood. (Filing No. 1.) Hood seeks review of the Commissioner of the Social Security Administration's decision to deny his application for disability insurance benefits under Title II of the Social Security Act (the Act), 42 U.S.C. §§ 401 *et seq.*, and for Supplemental Security Income (SSI) benefits under Title XVI of the Act, 42 U.S.C. §§ 1381 *et seq.*   The Court has carefully considered the transcript of the administrative record (Filing No. 9), the parties' briefs (Filing Nos. 16 and 22), and the Plaintiff's Index of Evidence (Filing No. 17).   For the following reasons, the Commissioner's decision will be reversed and remanded for further proceedings.

## PROCEDURAL BACKGROUND

Hood filed his application for benefits on July 6, 2006. (Tr. at 128-140.)  After his application was denied initially (*id.* at 83-84, 91-95) and on reconsideration (*id.* at 86-87, 96-101), he requested a hearing before an administrative law judge ("ALJ") (*id.* at 102). This hearing was held on December 10, 2008 (*id.* at 37), and in a decision dated May 5,

2009,[1] the ALJ concluded that Hood was not entitled to disability insurance benefits (*id.* at 26-36).    Hood then requested that the Appeals Counsel of the Social Security Administration review the ALJ's decision.  (*Id.* at 8.)  This request was denied on October 23, 2009 (*id.* at 1-3); therefore, the ALJ's decision stands as the final decision of the Commissioner of Social Security.

## FACTUAL BACKGROUND

Hood alleges that he became disabled on June 1, 2006, due to degenerative disk disease of the cervical spine and lumbar spine, borderline intellectual functioning, depression, asthma, diabetes, and obesity.  (Tr. at 14, 42, 184.)  He was born in February 1967, and he was 39 years old on the date of his alleged onset of disability.  (*E.g.*, *id.* at 20.)  He attended high school in Lincoln, Nebraska, but the last grade he completed was the tenth.  (*Id.* at 47.)   He has worked as an air duct cleaner, a "Heating-and-Air-Conditioning Installer-Servicer Helper," a grocery sacker, a cashier, and a carpet cleaner. (*Id.* at 172-174, 185, 230.)  He also worked in various "temp jobs."  (*Id.* at 199.)

### *Medical Evidence*[2]

On June 8, 2006, Hood visited the emergency room at Bryan LGH Medical Center-West in Lincoln, Nebraska, and reported that he was suffering from back pain and "burning in the right lateral thigh that ha[d] been ongoing on and off" during the preceding two

---

[1] The transcript contains two identically-worded copies of the ALJ's decision.  One of these copies is dated May 5, 2009 (Tr. at 36), and the other is dated May 30, 2009 (*id.* at 22).

[2] This review of the medical evidence will focus on records dating back to approximately June 1, 2006, which is the alleged disability onset date, and continuing through the date of the hearing before the ALJ.  It emphasizes the records cited by the parties in their briefs.

weeks.  (Tr. at 529.)  A lumbar spine x-ray revealed "a little degenerative change in L3, 4, and 5, but nothing acute [was] noted," and the pain in Hood's back resolved after he received an intramuscular injection of pain medication.  (*Id.* at 532.)  Hood was diagnosed with sciatica and low back pain, and he was "discharged in stable and improved condition" with instructions to take pain medication, to rest, and to remain off work for "a few days." (*Id.*)  He was also instructed to follow up with his primary care physician, Dr. Kristin Eberhardt, and obtain an MRI if he did not improve "with the conservative therapy."  (*Id.*)

On June 14, 2006, Hood visited Dr. Eberhardt and reported that his pain was "worse with standing," but that his medication "helps."  (Tr. at 322.)  Dr. Eberhardt recommended that Hood begin physical therapy and continue to take medication for pain.  (*Id.* at 321.)

A record indicates that on June 19, 2006, Hood reported to a Dr. Veskma that he had been suffering from "low back pain with recent onset of radiculitis" and "some numbness and tingling in the fingers of his right hand."  (Tr. at 600.)  Dr. Veskma diagnosed "Probable right CTS right hand" and "Chronic low back pain with recent exacerbation and lumbar radiculitis," and he instructed Hood to wear a wrist splint on his right hand, exercise his back, and treat his lower back pain with medication.  (*Id.*)

On August 7, 2006, Hood completed a "Daily Activities and Symptoms Report" in connection with his application for benefits.  (Tr. at 205-09.)  On his form, Hood indicated that he is able to care for his "day to day personal needs" without limitation.  (*Id.* at 205.)  He also indicated, however, that he can only stand for a short time when washing dishes "before [his] back starts to hurt," and that he does no outside chores because he doesn't "like to be out in the heat."  (*Id.*)  He reported that he cannot walk, stand, or sit for long

3

before he begins to experience pain in his ankles, back, or feet.  (*Id.* at 206.)  He added

that lying down and "pain pills" help reduce his pain.  (*Id.* at 207.)

On August 8, 2006, Ruilin Wang, M.D., performed a consultative examination of

Hood.  (Tr. at 426.)  Dr. Wang noted that Hood had a history of hypertension extending for

more than two years, a history of asthma extending for more than ten years, a history of

kidney stones, "chronic joint pain on both his ankles" that is "worse when walking," and

"chronic low back pain for more than two or three years."  (*Id.*)  In addition, Dr. Wang noted

that Hood had a history of depression and type II diabetes.  (*Id.* at 427.)  Hood stated that

he could walk no more than two blocks and stand for no more than 30 minutes.  (*Id.*)  He

also complained of "a dull aching pain on the lower back radiating to his right leg down to

the right foot and also a tingling and numbness sensation off and on of both lower

extremities."  (*Id.* at 426.)  On examination, Hood demonstrated "limited range of motion

from the C-spine down to the lumbar."  (*Id.* at 429.)  His gait was "stable and balanced."

(*Id.*)  Dr. Wang reviewed x-rays that showed "moderate degenerative changes from L2-L5,

L5-S1 level," "a bone spur . . . from L3, L4, L5, and S1 level," and "narrowing space

between L5 and S1."  (*Id.*)  Dr. Wang summarized his findings as follows:

> [T]he claimant has chronic low back pain, which significantly limits range of
> motion.  X-ray shows degenerative joint disease on the lumbar level from L3
> to S1 along with bony spurs noted.  Also the claimant has an episode of
> sciatic nerve neuropathy with shooting pain along the right leg down to the
> right foot.  The claimant is to follow up with Pain Clinic for further pain
> management and a possible MRI of the lumbar for further evaluation.
> Regarding the claimant's medical problems with elevated blood pressure,
> type II diabetes, hyperglycemia, hyperlipidemia, and asthma symptoms, he
> needs to follow up with the primary care physician regularly for management.

(Tr. at 430.)

4

On August 17, 2006, Judy C. Magnuson, Ph.D., performed a psychological evaluation of Hood. (Tr. at 431.) She noted that Hood "walked to the appointment" because "his car was in disrepair," and that he "had several excessive coughing spells" during the evaluation. (*Id.*) Hood reported that he has had difficulty learning and behaving properly since he was very young, and that he suffered depression "for an extended period of time." (*Id.* at 433.) Dr. Magnuson found Hood to be "well oriented" and "coherent," and his "thought processes were well organized." (*Id.* at 434.) She also found him to be of "near average intelligence" during the interview and observed that his "memory appears to be intact." (*Id.*) She noted that he "had no history of unusual perceptions or preoccupations," and although he "briefly suffered from visual hallucinations as a teenager, . . . this appeared to be a very brief problem during a psychiatric hospitalization." (*Id.* at 435.) Hood "had no recent psychiatric symptoms" and "appeared to have adequate capacity for judgement and insight." (*Id.*) Testing revealed that Hood's verbal IQ was 75, his performance IQ was 89, and his full scale IQ was 79, which "placed him at the top of the borderline range of intellectual functioning." (*Id.*) Dr. Magnuson observed that Hood seemed "to suffer some difficulty intellectually as a result of his lack of education," and that he "appears to be accurately identified in the borderline range of intellectual functioning, although he is very near low average in his intellectual ability." (*Id.*) She diagnosed "Depressive Disorder, not otherwise specified," "Borderline Intellectual Functioning," "Moderate problems in primary support system, financial problems, and medical problems,"

and a "Current GAF of 55." (*Id.* at 436.)[3]  Her evaluation also includes an addendum

stating,

> Michael has no restrictions of activities of daily living or difficulty maintaining social functioning.  He did not have episodes of deterioration when stressed.  Michael displayed the ability to sustain concentration and attention needed for task completion.  He displayed the ability to understand, remember, and carry out short and simple instructions under ordinary supervision.  He displayed the ability to relate appropriately to coworkers and supervisors and to adapt to changes in his environment.

(*Id.*)

Records indicate that Hood was scheduled for twenty aquatic physical therapy

treatments beginning with an initial evaluation on August 30, 2006, and ending with Hood's

discharge on or about October 20, 2006, "secondary to noncompliance with scheduled

sessions."  (Tr. at 476.)  It appears that Hood attended only 7 of 20 sessions, and the

discharge record states that his "[p]rogress [was] limited by patient's poor attendance."

(*Id.*)

On September 3, 2006, Linda Schmechel, Ph.D., completed a "Mental Residual

Functional Capacity Assessment" form after reviewing Hood's records.  (Tr. at 439-444.)

Dr. Schmechel concluded that Hood was moderately limited in the "ability to understand

and remember detailed instructions," the "ability to carry out detailed instructions," the

"ability to maintain attention and concentration for extended periods," the "ability to

complete a normal workday and workweek without interruptions from psychologically based

---

[3] "The GAF is a numeric scale ranging from zero to one hundred used to rate social, occupational and psychological functioning 'on a hypothetical continuum of mental health-illness.'" *Pate-Fires v. Astrue*, 564 F.3d 935, 937 n.1 (8th Cir. 2009) (quoting American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 1994)).

6

symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods," the "ability to interact appropriately with the general public," the "ability to accept instructions and respond appropriately to criticism from supervisors," and the "ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes." (*Id.* at 439-440.) She concluded that "he can do simple work that is within his range of physical capabilities." (*Id.* at 444.)

On October 26, 2006, Hood visited a Dr. Craig with complaints of right leg pain and "low back pain that radiates into his legs" and "makes it difficult for him to walk to the bus." (Tr. at 584.) Dr. Craig diagnosed "Diabetes with good control," "Varicose vein RLE," and "Chronic low back pain." (*Id.*) Hood was advised that support hose would relieve some of his symptoms, and an orthopedic consult was arranged for his back pain. (*Id.*; *see also id.* at 496.)

On November 10, 2006, Hood reported to Daniel P. Noble, M.D., on a referral from Dr. Craig. (Tr. at 496.) Dr. Noble noted that Hood was not in "any significant distress," and he was "alert, oriented, and cooperative to questions." (*Id.* at 497.) Hood was able to move from a sitting to a standing position "in a fluid manner" and "with moderate distress," and he walked "with a normal gait." (*Id.*) He had tenderness throughout his cervical and thoracic spine and on his left shoulder. (*Id.*) He also had back pain with leg raising and leg extension. (*Id.*) X-rays revealed "significant disc space narrowing L4-5 and L5-S1," "minor retrolisthesis of L4 on L5," and "anterior traction spurs at L4 and L5." (*Id.*) Dr. Noble diagnosed "[c]hronic low back pain with lumbar spondylosis and degenerative disc disease," "[l]eft shoulder pain with negative exam," "[d]iabetes mellitus," and "[o]besity."

7

(*Id.* at 497-98.) He opined that an MRI of the lumbar spine was not necessary unless Hood developed more persistent radicular complaints, and he concluded that losing weight "would certainly decrease his back pain and allow him to be more functional." (*Id.* at 498.) He recommended that Hood pursue an exercise program and a diet, and noted that these steps might also improve his diabetes. (*Id.*)

On November 22, 2006, Hood visited Richard Gustafson, M.D., with complaints of left neck and shoulder pain." (Tr. at 576.) Examination revealed full range of motion in the neck and shoulder and no muscle weakness, and Dr. Gustafson opined that Hood "seems to have a[n] exaggerated pain response at times." (*Id.*) Images were taken of Hood's cervical spine. (*Id.* at 499, 576.) These images revealed "chronic degenerative changes in the mid to lower cervical region." (*Id.* at 499.) Dr. Gustafson prescribed medication to treat Hood's pain complaints. (*Id.* at 576.)

On December 26, 2006, Hood returned to Dr. Noble, this time for an assessment of his neck pain. (Tr. at 607.) Dr. Noble noted that Hood did not "appear to be in any significant distress," was "alert, oriented and cooperative to questions," and was "able to get from a sitting to a standing position in a fluid manner and stood with a normal station and gait." (*Id.* at 608.) Examination revealed no palpable deformities in the cervical or thoracic spine and "minimally restricted range of motion of the cervical spine." (*Id.*) X-rays revealed "mild spondylosis of the cervical spine greatest at C4-5 and C6-7 where there is some disc space narrowing and marginal osteophyte formation." (*Id.* at 609.) Dr. Noble concluded that Hood did "appear to have inflammatory radiculopathy of the C7 nerve root,"

8

and stated that he "will initially attempt to treat that with a steroid taper" to reduce Hood's

symptoms.  (*Id.*)  The record also includes the following comment from Dr. Noble:

> Disability.  I was surprised to hear Michael say he is applying for disability.  Although he does have some mild diabetes as well as degenerative change in the cervical spine, I feel those problems are manageable and at least from my standpoint, he would not be considered to be disabled.  With respect to his low back pain, I think that can be simply monitored by a combination of job modification pursuing lighter work as well as obtaining a more optimal body weight which would also help his diabetes.

(*Id.*)

On February 27, 2007, Hood underwent an MRI of the cervical spine.  (Tr. at 616.)

The MRI revealed "[c]ongenital cervical canal stenosis" with a "probable partial fusion at

the C5-C6 disk space with a block type vertebra," "[e]xtensive degenerative changes with

broad posterolateral osteophytic ridging and/or protruding disk on the right at C4-C5," with

"some cord displacement and right nerve root impingement," "[s]imilar changes . . . on the

right at C6-C7 with probable right nerve root impingement," "[b]ilateral lateral recess and

neuroforamen encroachment at C7-T1," and "[l]eft lateral recess and left neuroforamen

encroachment at C3-C4 with mild central canal stenosis."  (*Id.* at 616.)

On March 26, 2007, Hood was examined by Eric Pierson, M.D., at Neurological and

Spinal Surgery, LLC.  (Tr. at 758.)  Dr. Pierson reviewed Hood's MRI results and history,

and reported that he did not "see a clear surgical indication here," and "would not

recommend consideration of surgery at this time."  (*Id.*)  Instead, he recommended

"physiatry evaluation and a trial of physical therapy."  (*Id.*)

On June 8, 2007, Hood visited Dr. Craig for a follow-up in connection with his neck

pain, back pain, diabetes and asthma.  (Tr. at 667.)  Dr. Craig noted that Hood had been

"going to P.T. which has decreased his upper body pain and numbness and he feels it's

9

been very helpful." (*Id.*)  Hood requested physical therapy for his lower back pain, and Dr. Craig obliged him with an order to that effect.  (*Id.*)  Also, Hood told Dr. Craig that "[r]ight now his long term goal in life is to get on disability."  (*Id.*)

On October 4, 2007, Hood returned to Dr. Craig due to "continuing neck and back pain" and "trouble with his anxiety and adjustment disorder."  (Tr. at 664.)  Dr. Craig opined that Hood should be sent "back for a neurosurgical opinion again," perhaps from Dr. Pierson.  (*Id.*)  X-rays taken on October 8, 2007, revealed "mild degenerative change in the mid and lower cervical spine," including "osteophytic spurring at the C4-C5 level and C6-C7 levels."  (*Id.* at 614.)  It was noted that the degenerative change was "mildly progressive from prior imaging of July 2003" at the C4-C5 level, but the C6-C7 levels were unchanged. (*Id.*)  Also, there was "no abnormal motion with either flexion or extension."  (*Id.*)  Dr. Pierson reviewed the x-rays, noting that "the alignment looks good."  (*Id.* at 754.)  He also noted that although there may be "some disc or spur at the Cervical 7-Thoracic 1 on the left causing the left hand numbness," he was "not at all certain that this is the answer."  (*Id.*)  Dr. Pierson recommended against surgery, and he also opined that Hood should avoid heavy lifting and jobs "like air duct cleaning . . . where his neck is extended."  (*Id.  See also id.* at 753.)

Hood returned to Dr. Craig on March 31, 2008, with complaints of "left sided neck pain which radiates down into his arm to about the elbow."  (Tr. at 661.)  "Lateral flexing to the left exacerbate[d] his symptoms," but there was no loss of muscle tone or strength, and range-of-motion in the shoulders, elbow and wrists were normal.  (*Id.*)  Dr. Craig noted that Hood "used cervical traction at P.T. before and relates that has been helpful," and he

10

opined that it may be desirable for Hood to get his own cervical traction unit in the future. (*Id.*)

On April 9, 2008, Hood returned to Dr. Craig for a follow-up.  (Tr. at 660.)  Hood reported that physical therapy seemed to be helping, and he was looking forward to the possibility of getting his own cervical traction unit.  (*Id.*)

On May 9, 2008, Hood visited Dr. Craig and reported that he had his own cervical traction unit, which was helping reduce his neck pain. (Tr. at 659.) Hood also reported that physical therapy "continues to make him feel better."  (*Id.*)  He did report sciatic pain, however, and his blood sugar was "out of control" because he had not been taking the proper dose of medication.  (*Id.*)

On June 18, 2008, Hood visited Dr. Craig and reported that he "strained his left shoulder doing some physical labor . . . a couple of weeks ago."  (Tr. at 658.)  He also reported that he was no longer in physical therapy because they felt that he had reached "maximum benefit as far as his low back pain," and he noted that he was "using his own cervical traction unit at home which [is] giving him relief from his cervical pain."  (*Id.*)

Hood returned to Dr. Craig for a follow-up on July 23, 2008.  (Tr. at 657.)  He complained of left shoulder pain, "pain in his right lateral neck," and "reflux disease," though he noted that "he tends to eat spicy foods and eats rather indiscriminately within a couple of hours of bedtime."  (*Id.*)  Dr. Craig observed that Hood "seems to be able to gesture quite freely with both shoulders," and he discussed "getting into Voc Rehab."  (*Id.*)

On August 13, 2008, Hood returned to Dr. Craig for another follow-up for his diabetes, shoulder pain, neck pain, and back pain.  (Tr. at 655.)  Dr. Craig noted, "His back

11

pain is new because he's been packing and getting ready to move." (*Id.*)  Dr. Craig

indicated that he would refer Hood to "P.T.," and stated, "I declined to give him a work

ability statement at this time as I don't see any reason why he shouldn't be looking for work

or entering Voc Rehab." (*Id.*)

Jan Husen-stortenbecker completed a "Vocational Assessment Summary" regarding

Hood on or about September 15, 2008.  (Tr. at 241.)[4]  The comments on this summary

state,

> Mike reports he has no idea in regards to a vocational direction.  He
> reports that he has not worked for the last 3 years and seriously questions
> if he has the emotional and physical tolerance to work.  He also made it clear
> that he feels he needs to be on social security disability and does not want
> to do anything that would interfere with this going through.  At this time it may
> be difficult for him to explore and develop alternatives.  At this time he
> doesn't have a GED so this maybe [sic] something he wants to work on to
> increase the vocational options he may have available.  Given his numerous
> limitations at this time his options are limited. . . .

(*Id.*)

On October 3, 2008, Hood visited Dr. Craig for a routine follow-up.  (Tr. at 653.)

Hood complained of increased depression, neck pain, shoulder pain, and wrist pain.  (*Id.*)

Some adjustments were made to his medication regimen, and Dr. Craig recommended that

Hood be sent "back to P.T. for his shoulders."  (*Id.*)

Hood visited Dr. Gustafson on October 15, 2008, and reported that he fell "off a

computer chair when he leaned back and a couple bolts broke and he landed on his back

and hit [a] trash can."  (Tr. at 652.)  He "complain[ed] of right sided neck and right sided

---

[4] The record also includes a "CareerScope" report and assessment profile dated
September 9, 2008, that outlines Hood's vocational interests and aptitudes.  (Tr. at 242-
253.)

lower back pain exacerbation since then." (*Id.*)  An examination revealed "fairly good" range-of-motion in the neck and no "bruising or ecchymosis in either the neck area or the lower back." (*Id.*)  Also, a straight leg raising test was negative. (*Id.*)  Medication was prescribed, and Dr. Gustafson noted that this "recent exacerbation" could be addressed in P.T.  (*Id.*)

On or about November 1, 2008, Hood completed a set of interrogatories from the Social Security Administration. (Tr. at 282-290.)  In his responses to these interrogatories, Hood indicated that he suffers from severe pain every day in his neck, back, shoulders, legs, hips, arms, and wrist that prevents him from working. (*Id.* at 284.)  He indicated that his medications make the pain "almost" bearable and that physical therapy and neck stabilizers also provide pain relief. (*Id.* at 285-86.)  He also indicated that he could, in an eight-hour day, stand for three hours, walk for one hour, and sit for four hours. (*Id.* at 287.)  He reported that the most he could lift was one gallon of milk in each hand, that he can perform all activities necessary for good personal hygiene, and that he can perform chores such as washing dishes for fifteen minutes at a time, doing some laundry, and making small meals. (*Id.* at 287, 289.)

On November 12, 2008, Hood returned for a follow-up with Dr. Craig. (Tr. at 651.)  Hood complained of "pain in his left gluteal region and in his left foot," mood swings, shoulder pain, and back pain. (*Id.*)  Hood reported, however, that his shoulder and back pain was being helped by his new physical therapist. (*Id.*)  Examination of Hood's foot was "totally normal," and Dr. Craig diagnosed "possible diabetic neuropathy." (*Id.*)  Dr. Craig made changes to Hood's medications, ordered him to continue with physical therapy, and

13

planned to see Hood again after his mental health appointment, which was scheduled for December 3. (*Id.*)

The record includes an "Initial Psychiatric Diagnostic Interview" signed by Patricia J. Bohart, M.D., and dated December 4, 2008. (Tr. at 777-79.) The document states that Hood was referred "by the Health Department and he would like to come to be evaluated for medication management." (*Id.* at 777.) Hood reported that "[h]e has had trouble with his moods fluctuating up and down throughout his life," but "for the last two years . . . things have gotten much worse." (*Id.*) Specifically, he related that his medical problems made him unable to function in his job carrying groceries for customers, and although he eventually got some of his medical problems taken care of at the Health Department, his home situation deteriorated when his girlfriend asked him to move out. (*Id.*) He also said, however, that he "is currently involved with a woman that he has just recently met and started a relationship with." (*Id.* at 779.) He reported a "depressed mood, tearful spells, a feeling that he wants to end it all, irritability and poor energy." (*Id.* at 777.) He also reported that he feels irritable and angry despite his medication, and his sleep is poor. (*Id.*) Dr. Bohart noted that Hood was pleasant and polite, with "adequate hygiene an[d] grooming." (*Id.* at 779.) He made good eye contact and was "very pleasant and cooperative." (*Id.*) His thoughts were "logical and goal directed," his "insight and judgment appear[ed] to be adequate," and he was not suicidal, homicidal, psychotic, delusional, or suffering from hallucinations. (*Id.*) He was "tearful at appropriate times," especially when talking "about losing his dog or the event surrounding his mother's death years ago." (*Id.*) Dr. Bohart diagnosed "Major Depressive Disorder, recurrent," and assigned a GAF score

14

of 45.  (*Id.*)  She altered Hood's medication, and noted that although Hood "might be appropriate for individual psychotherapy in the future," he was not interested in psychotherapy at the present time.  (*Id.*)  Dr. Bohart also signed a letter dated December 4, 2008, to "General Assistance," stating that Hood "suffers from a severe and persistent mood disturbance that renders [him] unable to hold, seek or secure gainful employment." (*Id.* at 780.)

On December 8, 2008, Hood participated in a work evaluation at WESCO Industries.  (Tr. at 233-36.)  During this evaluation, Hood "was given several time studies based on Department of Labor rules and regulations," and the quantity and quality of his work during these studies were rated on a six-category scale ("generally unacceptable," "far below average standards for individuals," "well below average standards for individuals," "significantly below average for individuals," approaches average standards for individuals," and "meets average standards for individuals").  (*Id.* at 234.)  In a "counting time study," Hood's work fell consistently in the "far below average standards" category; furthermore, he "shifted often in his seat," complained of neck pain, and, in five out of five trials, he failed to count papers accurately into piles of 100.  (*Id.* at 235.)  In alphabetizing, Hood's work fell "again in the far below average category," and he made at least two errors in each of three trials.  (*Id.*)  "Mr. Hood then shredded groups of two hundred papers by placing each paper individually into the shredder."  (*Id.*)  He performed this task four times, and his work scored in the "far below average standards" category.  (*Id.*)  Hood was then "evaluated on his cleaning skills."  (*Id.*)  First, he "was instructed to clean the interior of an entryway window and door."  (*Id.*) During this test, Hood "expressed difficulty bending and

15

stooping by verbal groaning . . . and [by] stating that he was experiencing pain in his neck and back." (*Id.*)  Next, he was instructed to clean a conference room using "a vacuum, dusting and wiping cloths, and a 5 quart bucket half filled with soapy water." (*Id.*)  It was determined that Hood's "production rates for cleaning the conference room and cleaning windows and doors would place him in the far below average standards of competitive industry norms." (*Id.* at 236.)  Hood's evaluator made the following general observations:

> Mr. Hood was visibly fatigued as the day progressed.  During the shredding time studies, Mr. Hood alternated between standing and sitting on a stool.  Mr. Hood stated that his shoulders, neck, and back were all aching. The cleaning of the door/windows and the conference room was also very taxing on Mr. Hood due to the bending, stooping, and standing.

> When holding an evaluation, some timed tasks are done in a room with other workers present while others are held in empty rooms with no distractions.  Mr. Hood appeared uneasy when with other workers.  During breaks and lunch, Mr. Hood would spend very limited time with others and instead would seek another room where he could sit by himself.

> During this evaluation, there was no evidence that Mr. Hood was under the influence of either drugs or alcohol.  He was willing to cooperate with me and I believe he tried his best at each task. . . .

> I believe that it would be very difficult for Mr. Hood to function independently in a competitive job market.  It is my opinion he would need assistance in locating a job that would suit his capabilities and limitations. It would be very difficult for Mr. Hood to maintain even an unskilled job due to his low quantity of work and his physical and mental issues.  All of these limitations would impede Mr. Hood's ability to secure and maintain competitive employment.

(*Id.*)

### Hood's Testimony

On December 10, 2008, Hood testified at the administrative hearing before the ALJ. (Tr. at 37-82.)  Hood described working as an air duct cleaner, a cashier at a gas station,

and a grocery sacker.  (*Id.* at 50-51, 55.)  The ALJ questioned why Hood applied for disability when his physicians thought he could work, and Hood responded that he had problems getting along with co-workers and supervisors.  (*Id.* at 55-56.)  Hood testified that he uses a neck stabilizer daily to obtain some relief from pain.  (*Id.* at 59.)  Nevertheless, he sometimes hears a grinding sound in his neck when he turns his head, and his pain immobilizes him.  (*Id.* at 62.)  He added that doing chores around the home sometimes aggravates his lower back pain and forces him to sit and rest.  (*Id.* at 63.)  His girlfriend, brother, and others help him with certain tasks.  (*Id.* at 65.)  Hood also explained that he once tried to obtain his GED at Southeast Community College, but his scores were low and he failed to take "the last two tests because they . . . were just hard for [him] to take."  (*Id.* at 61.)

### *Vocational Expert's Testimony*

The ALJ asked a vocational expert ("VE"), Dr. Michael McKemon, to consider a hypothetical claimant who is a "younger worker" with a "tenth-grade limited education" and Hood's work experience and who can occasionally lift or carry 20 pounds; can frequently lift or carry ten pounds; can stand, sit, or walk for at least six hours per day, can occasionally do "postural activities"; "should avoid hazards such as dangerous equipment or machinery"; "should not work in a job where he has to work overhead, or extend his arms above shoulder level"; can do work that does not require him to have extended concentration; can do work that is not detailed; can do work that is routine and repetitive; and can do work that requires occasional social interaction.  (Tr. at 68-69.)  The ALJ then asked the VE whether such a person could perform "a variety of unskilled light and

17

sedentary work." (*Id.* at 69.) The VE responded that such a person could do light cleaning work (2,538 jobs in Nebraska), light cashiering work (5,792 jobs in Nebraska), light janitorial work (1,563 jobs in Nebraska), and sedentary assembly work (467 jobs in Nebraska). (*Id.* at 69-70.) The VE added that such a person could perform "probably" 70% of light and sedentary unskilled work. (*Id.* at 70.) When asked whether Hood could perform those jobs in light of his testimony at the hearing, the VE responded in the negative, noting that Hood "needs to use a [neck] stabilizer repeatedly throughout the day" and has "trouble dealing with money, and the written word, and . . . comprehending things." (*Id.* at 71.) The VE also opined that, based on the WESCO report, Hood would be unable to perform any of the aforementioned unskilled sedentary and light jobs because Hood did not "perform to levels that would be acceptable" in his tests. (*Id.* at 72.) The VE added that he did not question the validity of the WESCO testing–though he thought it might be prudent to re-test Hood to determine the reliability of the tests–and he did not see a "strong inconsistency" between the WESCO testing and aptitude tests that Hood completed in 2003. (*Id.* at 72-76.)

***Post-hearing Medical Evidence***

On January 6, 2009, Nishna Productions, Inc. performed a work evaluation of Hood. (Tr. at 256-263.) On a test involving "placing screws into plastic handles," Hood "worked at 57% productivity as compared to workers without limitations." (*Id.* at 258-59.) On a test involving "labeling bags," Hood worked at 37% productivity. (*Id.* at 259-260.) On a test involving "putting candy into plastic eggs," Hood worked at 35% productivity. (*Id.* at 260.) On a test involving "countersinking plates," Hood worked at 41% productivity. (*Id.* at 260-

18

61.)  During the test, a staff person asked Hood "how he was doing."  (*Id.* at 260.)  Hood

replied, "I'm slow, but doing fine.  Your report will decide whether or not I get disability or

not."  (*Id.*)  On a test involving "packaging 24 pieces of product," Hood worked at 47%

productivity.  (*Id.* at 261.)  He stopped working during this test and complained of hand and

back pain.  (*Id.*)  He added that all of the tests caused him difficulty, and when the

examiner said, "I did not observe any pain or discomfort during the jobs you were doing

until you were completing the last job of packaging," Hood replied, "You won't see it unless

it really hurts.  I wanted to show I could do something and the pain medication does help,

but the pain was too much at the end."  (*Id.*)  It should be noted that the examiner *did*

observe Hood to be in discomfort at times during the testing, despite his or her statement

to the contrary.  (*Id.* at 258-59, 263.)  The evaluation report notes that Hood "did not

require close supervision on four of the five jobs"; that "[h]e understood and was able to

follow the instructions given"; that he "did not show any signs of emotional distress during

the evaluation" and accepted staff supervision; that his "appearance was acceptable for

the work environment"; that he was polite, cooperative, and had a good attitude; that his

production percentages were below standards; and that "[h]e completed four of the five

tasks with good quality."  (*Id.* at 262-63.)  In summary, the report states, "Michael's

productivity rate is low.  In addition, not being able to complete jobs requiring repetitive use

of grabbing items, as well as difficulty walking will be barriers to successfully competing in

the open job market."  (*Id.* at 263.)

　　　The record also includes a letter dated February 2, 2009, from David Hauswald of

Vocational Rehabilitation.  (Tr. at 240.)  The letter states that Hood had "been seen several

19

times" since the vocational assessment of September 15, 2008, and Hood reported that he was "living independently and going about ordinary day to day activities, shopping, socializing, watching movies and so forth." (*Id.*)  Hauswald noted that Hood had been encouraged to begin counseling at the Lancaster County Community Mental Health Center, and he had been scheduled to begin free General Education Development courses "within walking distance." (*Id.*)  Hood had also been "encouraged to be more active outside of his personal errands to do something for others and consider what kinds of simple work on a simple part time basis would be available in the business[es] or nonprofits within walking distance and on bus routes near his home." (*Id.*)

### THE ALJ'S DECISION

After following the five-step sequential evaluation process set out in 20 C.F.R. §§ 404.1520(a) and 416.920(a), the ALJ concluded that Hood is not disabled within the meaning of the Social Security Act.  (Tr. at 26-30, 34-35.)  At step one, the ALJ found that Hood has not engaged in substantial gainful work activity since June 1, 2006, the alleged onset date of disability.  (*Id.* at 28.)  At step two, the ALJ found that Hood has the following "severe" impairments: "Borderline intellectual functioning versus learning disability; depression; diabetes; obesity; and degenerative disk disease of the cervical spine and lumbar spine." (*Id.*)  At step three, the ALJ found that Hood does not have an impairment or combination of impairments that equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (*Id.* at 29.)  At step four, the ALJ determined that Hood has the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), with the following additional restrictions:

20

[Hood] can perform postural activities occasionally; avoid hazards such as dangerous equipment or machinery.  The claimant has no restriction on the use of his hands, but he should not work in a job requiring him to work overhead or extend his arms above shoulder level.

The claimant is limited to jobs with a Specific Vocational Preparation ("SVP") rating of 1 or 2; jobs that do not require extended concentration or detailed work; and jobs that are routine and repetitive.  He is limited to occasional, rather than constant or frequent, social interaction that is brief or superficial, with co-workers, supervisors, and the general public.

(*Id.* at 30.)  The ALJ also found that Hood is incapable of performing "any past relevant work."  (*Id.* at 34.)  At step five, the ALJ concluded that, given Hood's age, education, work experience, and RFC, "there are jobs that exist in significant numbers in the national economy that [he] can perform."  (*Id.* at 34.)  Specifically, the ALJ found that Hood could "perform the requirements of representative occupations such as . . . Cleaner . . . Cashier . . . Janitor . . . and Assembler."  (*Id.* at 34-35.)[5]

## STANDARD OF REVIEW

The Court must review the Commissioner's decision to determine "whether there is substantial evidence based on the entire record to support the ALJ's factual findings." *Johnson v. Chater*, 108 F.3d 178, 179 (8th Cir. 1997) (quoting *Clark v. Chater*, 75 F.3d 414, 416 (8th Cir. 1996)).  "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion."  *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008) (citations and internal quotation marks omitted).  A decision supported by substantial evidence may not be reversed, "even if

---

[5] "Through step four of this analysis, the claimant has the burden of showing that []he is disabled." *Steed v. Astrue*, 524 F.3d 872, 874 n.3 (8th Cir. 2008).  After the analysis reaches step five, however, "the burden shift[s] to the Commissioner to show that there are other jobs in the economy that [the] claimant can perform."  *Id.*

inconsistent conclusions may be drawn from the evidence, and even if [the court] may have reached a different outcome." *McNamara v. Astrue*, 590 F.3d 607, 610 (8th Cir. 2010). Nevertheless, the court's review "is more than a search of the record for evidence supporting the Commissioner's findings, and requires a scrutinizing analysis, not merely a 'rubber stamp' of the Commissioner's action." *Scott ex rel. Scott v. Astrue*, 529 F.3d 818, 821 (8th Cir. 2008) (citations, brackets, and internal quotation marks omitted). *See also Moore v. Astrue*, 623 F.3d 599, 602 (8th Cir. 2010) ("Our review extends beyond examining the record to find substantial evidence in support of the ALJ's decision; we also consider evidence in the record that fairly detracts from that decision.").

The Court must also determine whether the Commissioner's decision "is based on legal error." *Lowe v. Apfel*, 226 F.3d 969, 971 (8th Cir. 2000). The Court does not owe deference to the Commissioner's legal conclusions. *See Brueggemann v. Barnhart*, 348 F.3d 689, 692 (8th Cir. 2003).

## DISCUSSION

Hood claims that the Commissioner's decision must be reversed because: 1) "the ALJ has improperly weighed the medical evidence of record and reached an RFC finding which is unsupported by the record"; 2) "the ALJ's handling of the credibility issues in this case was inappropriate"; and 3) "the ALJ submitted an inaccurate hypothetical to the vocational expert and the vocational expert testimony in this case does not constitute substantial evidence upon which the ALJ can rely." (Filing No. 16 at 7, 12, 13.) Each of the Plaintiff's arguments will be analyzed below.

22

***The RFC Assessment***

Hood argues that the ALJ's residual functional capacity assessment is "unsupported by the record." (Filing No. 16 at 7.) "'Residual functional capacity' is defined as the most an individual can do despite the 'physical and mental limitations that affect what [the individual] can do in a work setting' and is assessed based on all medically determinable impairments, including those not found to be 'severe.'" *Baker v. Barnhart*, 457 F.3d 882, 889 n.3 (8th Cir. 2006) (citations omitted). "The ALJ should determine a claimant's RFC based on all the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations." *Davidson v. Astrue*, 578 F.3d 838, 844 (8th Cir. 2009) (quoting *Lacroix v. Barnhart*, 465 F.3d 881, 887 (8th Cir. 2006)). Hood submits that the ALJ committed five distinct errors in her evaluation of the relevant evidence. (Filing No. 16 at 8-12.) The Court will address each of these alleged errors in turn.

First, Hood claims that the ALJ erred by giving "significant weight" to his treating physicians' opinions that Hood is not disabled. (Filing No. 16 at 9.) In support of this point, Hood notes that the issue of disability is reserved to the Commissioner, and therefore a decision to give controlling weight to a physician's opinion on that issue "would be an abdication of the Commissioner's statutory responsibility." (*Id.* (quoting SSR 96-5p, 1996 WL 374183, at *2 (July 2, 1996)).) He adds that "[t]hese doctors have treated Plaintiff's physical impairment," but they "have no significant knowledge of Plaintiff's mental impairment" and no "access to the work evaluations which have shown that Plaintiff cannot work at a competitive pace." (*Id.*)

23

It is true that the ALJ's decision refers to Dr. Noble's opinion that Hood was not disabled. (*See* Tr. at 31-32.) It is also true that, in accordance with Social Security Ruling 96-5p, such opinions touch upon issues that are "reserved to the Commissioner" and cannot be given "controlling weight or special significance." 1996 WL 374183, at *2. Ruling 96-5p also states, however, that "adjudicators must always carefully consider medical source opinions about any issue, including opinions about issues that are reserved to the Commissioner," and that "the adjudicator must evaluate all the evidence in the case record to determine the extent to which [an] opinion [from a medical source on an issue reserved to the Commissioner] is supported by the record." *Id.* at *2-3. Here, the ALJ's decision states that "weight" was given to the opinions of Dr. Noble and others because their opinions "are based on clinical findings, are consistent with each other, and are consistent with other substantial medical evidence of record." (Tr. at 32-33.) Although the ALJ's decision could be clearer, the Court does not take it that "controlling weight" or "special significance" was given to Dr. Noble's opinion on disability. Rather, the Court finds that the ALJ's decision to afford weight to this opinion was consistent with Social Security Ruling 96-5p. Hood's point that Dr. Noble did not consider Hood's mental impairment and work evaluations when forming his opinion is well-taken, but the ALJ did not err by considering Dr. Noble's opinion when determining Hood's RFC.

Second, the Plaintiff claims that the "RFC does not accommodate the moderate limitations set out by reviewing consultant Dr. [Schmechel]" on a form dated September 3, 2006. (Filing No. 16. at 11.) More specifically, the Plaintiff argues that the ALJ erred by disregarding Dr. Schmechel's findings that Hood has a moderately limited ability "to complete a normal workday or work week without interruptions from psychologically based

24

symptoms," "to perform at a consistent pace without an unreasonable number and length of rest periods," "to interact appropriately with the general public," "to accept instructions and respond appropriately to criticism from supervisors," and "to get along with co-workers." (*Id.* at 9-10.) As the Defendant correctly notes, however, Dr. Schmechel is not a treating or examining medical source–her opinions were based on her review of the record–and therefore the ALJ was not bound to accept all of her opinions. Indeed, "[t]he opinions of non-treating practitioners who have attempted to evaluate the claimant without examination do not normally constitute substantial evidence on the record as a whole." *Shotos v. Barnhart*, 328 F.3d 418, 427 (8th Cir. 2003). The ALJ gave weight to the opinions of Dr. Magnuson, a consultative examiner who evaluated Hood on August 17, 2006. This was appropriate. *See* 20 C.F.R. § 404.1527(d)(1) ("Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you."); 20 C.F.R. § 416.927(d)(1) (same). Also, although it is true that the ALJ did not incorporate all of Dr. Schmechel's specific findings into her RFC determination, Dr. Schmechel's opinion that the Plaintiff had the mental RFC to "do simple work that is within his range of physical capabilities" (Tr. at 444) is consistent with the RFC determination. Under the circumstances, the Court finds that the ALJ's failure to adopt Dr. Schechel's opinions does not amount to reversible error.

Third, Hood argues that the ALJ's RFC determination is inconsistent with Dr. Bohart's opinions that Hood was incapable of employment and that his GAF score was only 45–"a number generally thought to be inconsistent with substantial gainful activity." (Filing No. 16. at 10, 11.) Dr. Bohart is a treating physician, and therefore her opinion "is accorded special deference under the social security regulations." *Vossen v. Astrue*, 612

25

F.3d 1011, 1017 (8th Cir. 2010) (quoting *Prosch v. Apfel*, 201 F.3d 1010, 1012-13 (8th Cir. 2000)).   *See also Dipple v. Astrue*, 601 F.3d 833, 836 (8th Cir. 2010) (explaining that a treating physician's opinion "will be granted controlling weight when [it is] well-supported by medically acceptable diagnostic techniques and not inconsistent with other substantial evidence in the record.").   Nevertheless, an ALJ may discount a treating physician's opinion under certain circumstances.   For example, a treating physician's opinion may be given reduced weight if other medical assessments are supported by superior medical evidence or if the treating physician has offered an inconsistent opinion.   *See Wagner v. Astrue*, 499 F.3d 842, 849 (8th Cir. 2007); *Holmstrom v. Massanari,* 270 F.3d 715, 720 (8th Cir. 2001). *See also Estes v. Barnhart,* 275 F.3d 722, 725 (8th Cir. 2002) (noting that the ALJ must "resolve conflicts among 'the various treating and examining physicians'").   Also, "[w]hen deciding 'how much weight to give a treating physician's opinion, an ALJ must also consider the length of the treatment relationship and the frequency of examinations.'" *Brown v. Astrue*, 611 F.3d 941, 951 (8th Cir. 2010) (quoting *Casey v. Astrue*, 503 F.3d 687, 692 (8th Cir. 2007)).   *See also* 20 C.F.R. § 404.1527(d)(2)(I); 20 C.F.R. § 416.927(d)(2)(I).   "When an ALJ discounts a treating physician's opinion, [s]he should give good reasons for doing so."   *Id.*

The ALJ's decision includes the following discussion of the weight that was afforded to Dr. Bohart's opinions.

> The undersigned has not given great weight to Dr. Bohart's statement that the claimant is unable to work.   The statement was directed to the office of General Assistance, whose disability criteria are not those of the Social Security Administration.   Further, the claimant has not previously sought mental health treatment, and a favorable response to prescribed medication can be expected within twelve months of December 2008.   Because he is a

26

> new patient she commented counseling "might be a good idea," but she has
> not worked with him long enough to assess his response to treatment.
> Accordingly, it has not been established that the twelve-month duration
> requirements for disability, at 20 CFR 404.1509 and 416.909, have been
> met.

(Tr. at 33.)  The ALJ also noted that Dr. Bohart "did not offer specific work restrictions"

when she opined that Hood was unable to work and that Hood's GAF score climbed to  51

within days of Dr. Bohart's initial assessment.  (*Id.*; *see also* Tr. at 774, 776, 779.)

Hood has not criticized the ALJ's specific reasons for declining to give great weight

to Dr. Bohart's opinion; instead, he argues simply – and accurately – that the ALJ's RFC

determination is inconsistent with Dr. Bohart's opinion.  (Filing No. 16 at 11.)  The Court

finds that this inconsistency does not amount to error because the ALJ offered "good

reasons" for discounting Dr. Bohart's opinion, including the newness of the treating

relationship between Dr. Bohart and Hood.  *See Brown v. Astrue*, 611 F.3d 941, 951 (8th

Cir. 2010); 20 C.F.R. § 404.1527(d)(2)(I); 20 C.F.R. § 416.927(d)(2)(I).

Fourth, Hood argues that the ALJ's RFC determination "does not accurately address

Plaintiff's borderline intellectual functioning."  (Filing No. 16 at 11.)  Hood adds that

"[b]orderline intellectual functioning, if supported by the record, is a significant non-

exertional impairment that must be considered by a vocational expert."  (*Id.* (citing *Swope

v. Barnhart*, 436 F.3d 1023, 1025 (8th Cir. 2006)).)

In *Swope v. Barnhart*, the Eighth Circuit determined that a remand was necessary

because "[t]he ALJ's hypothetical to the vocational expert failed to reference Swope's

limited intellectual functioning."  436 F.3d at 1024.  As the Plaintiff indicates in his brief, the

court explained, "Time and again, this court has 'concluded that borderline intellectual

functioning, if supported by the record as it is here, is a significant nonexertional

27

impairment that must be considered by a vocational expert.'" *Id.* at 1025 (citation and quotation marks omitted).  The Eighth Circuit has since clarified, however, that "[i]n *Swope*, the error was not the ALJ's failure to use the term 'borderline intellectual functioning' in the hypothetical posed to the vocational expert, rather the ALJ erred in not including *any* reference to the claimant's intellectual capacity."  *Gragg v. Astrue*, 615 F.3d 932, 941 (8th Cir. 2010).   If the ALJ includes the limitations imposed by the claimant's cognitive impairments in the hypothetical, it is unnecessary to refer to the claimant's specific medical conditions.  *Id.*

In this case, the ALJ's hypothetical to the VE did not include the words "borderline intellectual functioning," nor did it include a specific reference to Hood's IQ scores.  (*See* Tr. at 68-69.)  As noted above, this is not necessarily fatal.  *See Gragg*, 615 F.3d at 941. The ALJ's hypothetical *does* include a reference to Hood's "tenth-grade limited education," and it restricts the hypothetical claimant to "unskilled" jobs that are "SVP one or two";[6] do not "require him to have extended concentration, or do detailed work"; and are "routine"

[6] The Eighth Circuit explains,

> According to the regulations, unskilled work "needs little or no judgment to do simple duties that can be learned on the job in a short period of time." 20 C.F.R. § 416.968(a).  Unskilled work is the "least complex type [ ] of work," SSR 82-41, 1982 WL 31389 (1982), corresponding to a specific vocational preparation (SVP) level of one or two in the DOT.  SSR 00-4P, 2000 WL 1898704 (Dec. 4, 2000).  The SVP level listed for each occupation in the DOT connotes the time needed to learn the techniques, acquire the information, and develop the facility needed for average work performance. At SVP level one, an occupation requires only a short demonstration, while level two covers occupations that require more than a short demonstration but not more than one month of vocational preparation.  2 Dictionary of Occupational Titles app. C, at 1009 (4th ed.1991).

*Hulsey v. Astrue*, 622 F.3d 917, 922-23 (8th Cir. 2010) (omission in original).

28

and "repetitive." (*Id.*)  The Plaintiff's does not explain why these aspects of the ALJ's hypothetical to the VE do not "address" Hood's borderline intellectual functioning "accurately," (Filing No. 16 at 11), and in the absence of any meaningful argument to the contrary, the Court finds that the hypothetical did sufficiently incorporate the limitations of Hood's intellectual capacity.

Fifth, and finally, Hood argues that the ALJ erred by ignoring completely the WESCO Industries and Nishna Productions, Inc., work evaluations.  (Filing No. 16 at 11.)  The Court agrees with the Plaintiff.

At the time of the administrative hearing, only the WESCO evaluation was available to the ALJ.  The ALJ asked the VE whether, based on the WESCO report, Hood "could do the type of unskilled sedentary and light jobs" that the VE identified in response to the ALJ's hypothetical question.  (Tr. at 72.)  The VE responded in the negative, stating that "the results were quite low, which would indicate that at least during this testing [Hood] didn't perform to levels that would be acceptable." (*Id.*)  The ALJ then seemed to question whether the evaluation could distinguish a worker who is "objective[ly]" slow from one who "just . . . works slow when they [sic] go to the evaluation." (*Id.*)  The VE responded that he did not doubt the validity of the testing, though he felt that retesting could help clarify whether Hood's lack of motivation or effort affected the results.  (*Id.* at 72-73.)  The ALJ and the VE then discussed the significance of "a test that was done back in 2003," and the VE explained that the ALJ was not interpreting the test correctly.  (*Id.* at 73-75.)  The VE added that he would not say that the 2003 test and the WESCO evaluation were inconsistent, but he added that further testing would be "nice" to help determine "if there

29

are any other motivational factors." (*Id.* at 75-76.)  After the hearing but before the ALJ

issued her decision, Hood underwent a second work evaluation at Nishna Productions, Inc.

(*Id.* at 256-263.)  This evaluation appears to be consistent with the WESCO evaluation

insofar as it concludes that Hood's "production percentages were below standards" and his

"productivity rate is low." (*Id.* at 263.)  In short, it seems that the sort of retesting deemed

desirable by the VE was performed, and the results may well reinforce the findings set forth

in the WESCO report.

Social Security Ruling 96-8p states specifically that if work evaluations are available,

they must be considered when a claimant's RFC is assessed.  1996 WL 374184, at *5

(July 2, 1996).  It also states that, when assessing a claimant's RFC, "[t]he adjudicator

must . . . explain how any material inconsistencies or ambiguities in the evidence in the

case record were considered and resolved." *Id.* at *7.  Furthermore, Social Security Ruling

85-16 states that "[i]nformation derived from workshop evaluations must be used in

conjunction with the clinical evidence of impairment, but all conflicts between workshop

evaluation evidence and the conclusions based on objective medical findings must be

resolved." 1938-1991 Soc. Sec. Rep. Serv. 352, 1985 WL 56855, at *4 (1985).  In this

case, the VE testified that if the WESCO work evaluation were considered, Hood would be

unable to perform the work identified by the VE at step five of the sequential evaluation

process.  Although the VE identified a possible weakness in the report (i.e., the lack of

retesting), that weakness may well have been addressed by the Nishna Productions report.

In short, there is apparent, material tension between the work evaluations and the ALJ's

RFC assessment, but the ALJ failed to explain how she resolved this tension.  Her failure

to do so conflicts with the applicable Social Security Rulings and requires a remand.

30

In opposition to the Plaintiff's argument, the Defendant concedes that the ALJ did not discuss the work evaluations in her decision, but he submits that this "does not mean that the ALJ did not consider the evaluations when assessing Plaintiff's mental capacity for work." (Filing No. 22 at 22 (emphasis omitted).) In support of this argument, the Defendant cites "an unpublished per curiam decision," *Engelhart v. Barnhart*, 207 F. App'x 739 (8th Cir. 2006). In *Engelhart*, the Eighth Circuit stated simply that "[t]he ALJ's failure to discuss a 2003 workshop evaluation does not mean it was not considered, and contrary to Engelhart's suggestion, such an evaluation is not per se determinative." 207 F. App'x at 741 (citations omitted).

It is well-established that an ALJ is not required to discuss all of the evidence in the record in order "to develop the record fully and fairly." *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000). It is also well-established that "an ALJ's failure to cite specific evidence does not indicate that it was not considered." *Id.* The Court finds, however, that under the circumstances of this case, and under the applicable Social Security Rulings, the ALJ had an obligation to do more than *consider* the work assessments. Because the work evaluations were inconsistent with the ALJ's RFC determination and central to the disability determination–indeed, the VE's testimony seems to establish that if the WESCO evaluation is taken into account, Hood is unable to perform the jobs identified by the VE–the ALJ was obligated to *explain* how she considered and resolved the inconsistency.

In *Engelhart*, the Eighth Circuit noted that the work evaluation was "not per se determinative," citing Social Security Ruling 96-8p, 1996 WL 374184, at *5 (July 2, 1996), which lists the types of evidence that must be considered when an adjudicator assesses

31

a claimant's RFC.  *See* 207 F. App'x at 741.[7]  The Court takes the Eighth Circuit's point to be that a work evaluation, standing alone, does not determine a claimant's RFC, but that "*all* of the relevant evidence in the case record" must be incorporated into the RFC assessment.  SSR 96-8p, 1996 WL 374184, at *5 (July 2, 1996).  In remanding this case for further proceedings, the Court does not mean to imply that the work evaluations are outcome-determinative, or that the remand can only be for an award of benefits.  There may be valid reasons for discrediting the work evaluations, but the Commissioner must decide, in the first instance, how to resolve the inconsistencies in the record.

As noted above, this Court's review of the Commissioner's decision requires an examination of the evidence that detracts from that decision.  *Moore v. Astrue*, 623 F.3d 599, 602 (8th Cir. 2010).  The VE's testimony indicates that, based on the work evaluations, Hood is unable to perform the jobs identified in response to the ALJ's hypothetical question.  Put differently, the work evaluations so conflict with the ALJ's RFC assessment that, unless the work evaluations are discounted for valid reasons, it cannot be said that substantial evidence supports the Commissioner's decision.  It was error for the ALJ to fail to address these evaluations, and the case must be remanded so that they may be incorporated into the RFC analysis in accordance with the applicable Rulings.

**The Credibility Assessment**

Hood argues that the ALJ erred because she "made no specific, enumerated credibility findings in this case."  (Filing No. 16 at 12.)  More specifically, he argues that "the

---

[7] As noted above, this list of evidence includes work evaluations.  *See* SSR 96-8p, 1996 WL 374184, at *5 (July 2, 1996).

ALJ did not follow the required two-step process for evaluating Plaintiff's claim." (*Id.*) Hood's argument is without merit.

The parties are in agreement that the applicable regulations and Social Security Ruling 96-7p require an ALJ to follow a two-step process when evaluating the credibility of a claimant's subjective complaints. *See* 20 C.F.R. § 404.1529(b)-(c); 20 C.F.R. § 416.929(b)-(c); SSR 96-7p, 1996 WL 374186 (July 2, 1996). At the first step, "the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment . . . that could reasonably be expected to produce the individual's pain or other symptoms." SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). Hood argues that the ALJ erred at this step because "the ALJ made no such determination." (Filing No. 16 at 12.) On the contrary, the ALJ clearly resolved this step in Hood's favor, stating, "After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms." (Tr. at 31.)

At step two, "once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities." SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). The Eighth Circuit explains,

> In assessing a claimant's credibility, the ALJ must consider all of the evidence relating to the subjective complaints, the claimant's work record, observations of third parties, and the reports of treating and examining physicians. 20 C.F.R. § 404.1529(c)(3); *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). The ALJ should consider the claimant's daily routine;

> duration, frequency, and intensity of the pain; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. *Polaski*, 739 F.2d at 1322. When rejecting a claimant's complaints of pain, the ALJ must make an express credibility determination, detailing the reasons for discounting the testimony, setting forth the inconsistencies, and discussing the *Polaski* factors.

*Dipple v. Astrue*, 601 F.3d 833, 836-37 (8th Cir. 2010). The ALJ is not required to discuss each of these "*Polaski* factors" methodically, however, provided that she "acknowledges and considers the factors before discounting a claimant's subjective complaints." *Halverson v. Astrue*, 600 F.3d 922, 932 (8th Cir. 2010) (quoting *Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009)).

Here, the ALJ found at step two that "the claimant's statements concerning the intensity, persistence and limiting effects of [the alleged] symptoms are not credible to the extent they are inconsistent with the . . . residual functional capacity assessment." (Tr. at 31.) In support of this finding, the ALJ reviewed the reports of several treating and examining physicians and vocational rehabilitation staff, noted instances of Hood's treatment noncompliance, commented that "the claimant's earnings record shows earnings below substantial gainful activity levels for most years since 1985 and reflects unfavorably on his credibility," and observed that "Vocational Rehabilitation records . . . suggest the claimant may be pursuing disability before investigating job opportunities." (Tr. at 31-33.) She also noted that Hood's medication was effective and there was no evidence of side effects; she reviewed Hood's claims about his ability to stand, walk, sit, and lift; and she discussed Hood's self-described daily activities. (*Id.* at 33.) Hood does not take issue with any particular aspect of the ALJ's credibility determination, save one: he submits that "Plaintiff's lack of work or substantial earnings is consistent with his mental and physical

34

limitations and should bolster his credibility." (Filing No. 16 at 13.) On the contrary, it is quite proper for the ALJ to infer from Hood's poor work history that he lacks *motivation* to work rather than *ability* to work–particularly where, as here, his lack of gainful employment extends far beyond the alleged onset date. *E.g., Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2008) (citing *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001)). The Court finds that the ALJ articulated detailed reasons for discrediting Hood's testimony. There is no error.[8]

### *The Hypothetical Question Posed to the VE*

Finally, Hood argues that the hypothetical question presented to the VE was inadequate because it does not "properly incorporate the restrictions set forth by the testimony of Plaintiff or the opinions of consulting psychologists or Plaintiff's treating psychiatrist," it "does not incorporate the moderate pace limitations set out [by Dr. Schmechel]," and it does not include "the clear indications that Plaintiff is not capable [of] working at a competitive pace as determined by both work evaluations." (Filing No. 16 at 15.)

Hood's argument against the adequacy of the hypothetical question derives from the arguments that the Court has analyzed above. In other words, Hood submits that the hypothetical is defective due to the ALJ's failure to assess properly his RFC and his credibility. With one exception, each of these arguments has been rejected. At this point, the Court cannot say whether the hypothetical presented to the ALJ ought to have included the limitations specified in the work evaluations; the Commissioner must first determine the

---

[8] The Court notes in passing that on remand, it may be necessary to factor the work evaluations discussed above into a credibility analysis.

35

weight to be afforded to those evaluations in light of the entire record.  Thus, the foundation for Commissioner's step five determination generally, and the sufficiency of the hypothetical posed to the VE specifically, are issues that should be taken up on remand after the Commissioner has incorporated the work evaluations into his analysis.

## CONCLUSION

For the reasons discussed, the Court concludes that the Commissioner's decision denying benefits must be reversed, and the case is remanded for further proceedings consistent with this opinion.

IT IS ORDERED that the decision of the Commissioner is reversed and remanded for further proceedings consistent with the memorandum and order, the appeal is granted, and a separate Judgment in favor of the Plaintiff will be entered.

DATED this 29th day of December, 2010.

BY THE COURT:

s/Laurie Smith Camp
United States District Judge